# Francis M. Cowling

v.

# Benjamin F. Estes.

1. Fraudulent conveyance.—The court is of opinion that the circumstances in this case clearly show that the conveyance by the debtor was made with the intent and design to defraud his creditors, and that the purchaser had notice of such fraud.

2. Purchaser with notice.—When a debtor has conveyed to a purchaser for value, with the intent and design to defraud his creditors, it is not necessary that the purchaser should have purchased with the intention of aiding the vendor in his fraudulent design, in order to enable the creditor of the vendor to have the conveyance set aside as fraudulent. If the purchaser accepts the conveyance with notice of the fraudulent intent on the part of the grantor, the property so purchased may be subjected to the payment of the debts of the fraudulent vendor.

3. Notice, how established.—Notice to the purchaser may be established by proving direct and positive knowledge on his part, or the notice may be inferred from the existence of certain facts and circumstances, that would place a man of ordinary prudence on inquiry with reference to the conduct of the vendor.

4. Sale hindering and delaying creditors.—A sale of a debtor's property upon a long and unusual credit has a tendency to hinder and delay creditors by interposing a legal title between them and the debtor and consequently is a badge of fraud.

5. Fraud, how proved.—While it is true that fraud can not be inferred, yet like all other facts it may be proved by circumstances. Circumstances when proved which convince the mind that the fraud charged has been perpetrated, is all that is necessary.

Appeal from the Circuit Court of Wabash county; the Hon. C. S. Congor, Judge, presiding. Opinion filed October 10, 1884.

Mr. S. Z. Landes, Messrs. Barr & Lemma and Messrs. Patton & Watson, for appellant; cited Bump on Fraudulent Conveyances, 79, 80, 81, 86, 89, 90, 94, 96.

As to notice to a purchaser of a fraudulent vendor: Baker v. Bliss, 39 N. Y. 70; Johnson v. Harvey, 2 Penn. 82; Ringgold v. Waggoner, 14 Ark. 69; Knox v. Hunt, 18 Mo. 174; Bump on Fraudulent Conveyances, 478; Boies v. Henney, 32 Ill. 140; Steere v. Hoagland, 50 Ill. 377; Zuver v. Lyons, 50 Ill. 377; Jones v. Hetherington, 45 Ia. 681.

As to proof of fraud: Bullock v. Narrott, 49 Ill. 62; Strauss v. Kranert, 56 Ill. 254; Nesbitt v. Digby, 13 Ill. 387; Bryant v. Simoneau, 51 Ill. 327.

Messrs. BELL & GREEN, for appellee; that the fact that Morrow was heavily indebted at the time of the sale to appellee, is no evidence of fraud, for if his creditors had no liens on the stock of merchandise, Morrow had the right to sell to whom he pleased, cited Nelson v. Smith, 28 Ill. 495; Hessing v. McCloskey, 37 Ill. 341, Miller v. Kirby, 74 Ill. 242; Holbrook v. National Bk., 10 Bradwell, 140.

Both vendor and vendee must be shown to have intended to commit the fraud before the deed can be avoided: Ewing v. Runkle, 20 Ill. 448; Myers v. Kinzie, 26 Ill. 36; Gridley v. Bingham, 51 Ill. 153; Hatch v. Jordan, 74 Ill. 414.

CASEY, P. J. This was an action of trespass, brought by appellee against appellant in the Circuit Court of Wabash county. The defendant filed four pleas: First, the general issue; second, that the defendant was the sheriff of Wabash county, and that he took the goods and merchandise described in the declaration by virtue of certain writs of attachment issued by the clerk of the Circuit Court of Wabash county, at the instance of various parties, creditors of W. Morrow & Co., and that the goods and merchandise were not the property of the plaintiff.

The third plea shows a license upon the part of plaintiff to take the goods, etc.

The fourth plea is the same as the second except that there is an additional averment, that the goods and merchandise attached were, on the 2d day of January, A. D. 1884, fraudulently transferred to the plaintiff by Wm. Morrow & Co. for the purpose of hindering and delaying their creditors; that the plaintiff participated in the fraud. Issue was found on these pleas. The cause was by agreement submitted to the court, a jury being waived. The court found for the plaintiff, and entered a judgment for the plaintiff and against the defendant for the sum of $4,550 and costs. A motion for a new

trial was entered by the defendant and refused by the court. Exceptions were taken to the ruling of the court and the case is brought to this court by appeal. The only question for consideration is, was the transaction between Morrow and appellee fraudulent?

The principal and material facts are, that in July, 1883, Wilson Morrow removed from Gallatin, Illinois, to Mt. Carmel in said State with a stock of dry goods and began business in Mt. Carmel. On the 8th day of September, 1883, Morrow formed a partnership with Geo. W. Hicks in the mercantile business. At that time the goods held by Morrow were invoiced in the sum of $2,300. Most of the goods were in a damaged condition, upon which Morrow owed $1,500 or $2,000. Hicks agreed to put $800 cash in the business. Morrow then stated that he was indebted for the goods, but did not owe any borrowed money. This firm was in existence sixty days, when Morrow, for some reason which does not appear on the record, became dissatisfied and induced Hicks to retire from the business. In the meantime the stock of goods had been largely increased and was at the time of the dissolution of the partnership valued at $9,500, upon which the firm was indebted in the sum of $5,700, none of which indebtedness was then due. When the partnership with Hicks was dissolved Morrow paid Hicks $150, and agreed to give him two promissory notes, one for the sum of $300 and the other for the sum of $350, due respectively in six and twelve months, with his brother and mother as sureties. Neither of these notes have ever been given so far as the record shows. On the 2d of January, 1884, Morrow claims to have sold and transferred the entire stock of goods and merchandise in question to appellee.

After a careful consideration of the testimony we do not entertain a doubt but what Morrow intended to cheat, hinder and delay his creditors. His stock of goods when he removed to Mt. Carmel, as we have said, was very inferior and in a damaged condition. He formed the partnership with Hicks and continued it in existence until he was enabled thereby to get a large stock of goods. His causes of disagreement with

Hicks were imaginary and part of a preconcerted plan. The firm was then doing a good business. It was paying its indebtedness before maturity.

Immediately upon the dissolution of the partnership, Morrow ceased to pay anything on his indebtedness.

Before then the firm had been discounting its bills. He continued in business until his creditors became anxious in regard to their claims. They were pressing him. He then wrote to his kinsman by marriage, appellee, to come to see him, saying: "Come up here at once, I have something I can put you on there is money in." The immediate sale to his kinsman by marriage, on long time, without interest and without security, without a dollar being paid in cash, when he knew his creditors were entitled to their money in good faith, and when he knew he could not make a dollar on execution against appellee; the immediate transfer to his wife of the four notes of appellee first becoming due, amounting to the sum of $2,444.65, to pay her, as he claimed, for money borrowed some years before that, when he had stated to Hicks he did not owe anything for borrowed money, and the transfer of the two notes of appellee, maturing next after those he had given his wife, amounting to $1,000, to his brother, to secure him as surety on his, (Morrow's) notes to Hicks, when the notes were never delivered to Hicks; the sale without invoice or inventory, under the circumstances, to appellee, without a dollar in cash as aforesaid, and without the consent of his creditors, when they were pressing him for their money, for a less sum than the goods were worth, as shown by himself, by appellee, and by Hicks; his refusal to comply with the reasonable demand of his creditors to allow them to see his books until "they were fixed," and his refusal to give his creditors any satisfaction or plausible excuse therefor, his immediate departure after the transfer, to Texas, as appellee supposed; the fact that Shannon offered to take the goods and pay the debts, the refusal upon the part of Morrow, the fact that Morrow refused to transfer to his creditors any of the notes received from appellee; that he offered his creditors twenty-five cents on the dollar when it was in his power to have paid the entire sum

Cowling v. Estes.

due.  As we have said, all these facts and circumstances leave no doubt in our minds that there was clearly a premeditated attempt on the part of Morrow to cheat his creditors.  It was a " bald fraud."  There seems to be no doubt but that he had that object in view when he induced Hicks to retire from the business.  He had used Hicks for the purpose of replenishing his stock of goods; then he sought his kinsman to aid him in perpetrating the fraud upon his creditors.

The only question about which there can be any difficulty or uncertainty, is, did appellee so far participate in the fraud perpetrated by Morrow, as to prevent him from being an innocent purchaser for a valuable consideration, or were the facts and surrounding circumstances such as to put an ordinarily prudent business man on his guard, and cause him to make an inquiry as to the honesty of the transaction on the part of Morrow.  In regard to this point we have carefully examined the testimony, and are forced to the conclusion that appellee knew of the fraudulent intent of Morrow and that in fact he was knowingly aiding Morrow in defrauding his creditors.

The manner in which his invitation to Mt. Carmel came: " I have something I can put you on there is money in," was to say the least, unusual; subsequent events showed there was money in it if the fraud was not discovered.  If the transaction was fair and honest there was no reason why Morrow should not have stated what it was there " was money in."

The fact that he knew Morrow was largely indebted for the merchandise, would lead an ordinarily prudent man to inquire as to the amount, at least, of the indebtedness.  It is true that appellee denies that he knew Morrow was indebted for the goods, but it is proven by two witnesses, who have no financial interest in the result of the suit; besides four of the neighbors of appellee testify that they would not believe him under oath.

The fact that appellee examined the books of Morrow, that he is a " shrewd business man, " and was getting goods, valued at $7,000 or $8,000, for a much smaller sum on long time, reaching two years, that he was giving his notes therefor without interest and without security,

that appellee boarded with and stayed at the house of Morrow, that they frequently had secret and long conferences and confidential interviews, as we have said, force us to believe, not alone that appellee had sufficient information to put him on his guard, that he knew such facts as would excite the suspicions of an honest man, but, in fact he knew that Morrow was intending to swindle and defraud his creditors, if he could.

Appellee gave his note to Morrow for $6,400; the judgment in this case was for $4,550—more than eighteen hundred dollars less than the amount of his note. The goods seem to have been worth more than the amount paid by appellee. If appellee ever honestly expected to pay his note, it is very extraordinary that he did not accept or agree to the motion for a new trial by appellant.

From the relation, connection and circumstances surrounding the parties, as shown by the record, it is unreasonable to suppose that appellee was ignorant as to the evident intention of Morrow. The law in such cases is well established.

If the facts and circumstances were such as to place a man of ordinary prudence and business capacity upon inquiry with reference to the honesty of the transaction, he will not be justified in closing his eyes and refusing to investigate. If he pursues that course, he is not a purchaser in good faith, and is affected with any fraud upon prior creditors affected by the sale.

When a debtor has conveyed to a purchaser for value, with the intent and design to defraud his creditors, it is not necessary that the purchaser should have purchased with the intention of aiding the vendor in his fraudulent design in order to enable the creditor of the vendor to have the conveyance set aside as fraudulent.

If the purchaser accepts the conveyance with notice of the fraudulent intent on the part of the grantor, the property so purchased may be subjected to the payment of the debts of the fraudulent vendor. "Notice to the purchaser may be established by proving direct and positive knowledge on his part, or the notice may be inferred from the existence of cer-

Cowling v. Estes.

tain facts and circumstances that would place a man of ordinary prudence on inquiry with reference to the conduct of his vendor."

The conduct of appellee in making the purchase, even if it was made without an inquiry as to the condition or intent of the vendor, did "hinder and delay the creditors of his vendor," and the sale can not be maintained.

Creditors are entitled to sell the property of the debtor, and any expedient adopted by the debtor with the clear intent to prevent that, is fraudulent.

It is a hindrance and delay within the meaning of the statute.

A sale of his property upon a long and unusual credit has a tendency to hinder and delay creditors by interposing a legal title between them and the debtor's estate, and consequently is a badge of fraud; but if the debtor is insolvent and his intent is to coerce his creditors to accept notes drawn for a long time, or keep them at bay until the time of credit expires, the purpose is fraudulent. This is especially true when the sale is not in continuance with the debtor's business, with an honest effort to retrieve his fortunes, but is made as an abandonment of his business. Bump on Frauds, 89, 90.

It is true that fraud can not be inferred. It can not be presumed. It must be proved. But like all other facts it may be proved by circumstances. It very seldom can be proved by direct and positive testimony. Circumstances, when proven, which convince the mind that the fraud charged has been perpetrated, is all that is necessary.

Circumstances which merely raise a suspicion are not sufficient, but when they are so strong as to produce conviction of the truth of the charge, although there may remain some doubt, then it is proved.

This is the extent of the rule that fraud must be proved. Bullock v. Narrott, 49 Ill. 62; Bryant et al. v. Simoneau et al., 51 Ill. 324.

Plans and conspiracies to cheat and defraud are concocted in secret, in secret interviews. No one concerned while the existing relations are friendly will proclaim them from the

house top, and great industry, patience and sagacity is required to expose them.

Fraud loves deceit and strategem, and its inextricable windings often can only be discovered, traced and exposed by circumstances. Steere v. Hoagland, 50 Ill. 377; Strauss et al. v. Kraner, 56 Ill. 254.

The facts show in this case that the least inquiry by appellee of Morrow, or his clerks, or an inspection of the ledger, would have disclosed the whole facts of this fraudulent transaction. And the evidence further shows that appellee did examine the ledger so that he can not be regarded as an innocent purchaser. Baker v. Bliss, 39 N. Y. 70; Ringgold v. Waggoner, 14 Ark. 69; Knox v. Hunt et al., 18 Mo. 174; Sugden on Vendors, Ch. 17, Sec. 2; 4 Kent's Com. 179; Hanley v. Cramer, 4 Cowen, 718; Cutter v. Hart, 1 A. K. Marshall, 41; Williamson v. Buren, 15 N. Y. 362; Gray v. St John, 35 Ill. 227.

For the reasons given the judgment of the circuit court is reversed and the cause remanded.

Reversed and remanded.